SC:DAS/PKC
F. #2011R02163

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**MISC. 12-238**

- - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION OF THE
UNITED STATES OF AMERICA FOR AN ORDER
AUTHORIZING THE INSTALLATION, USE,
MONITORING, REPAIR, REPLACEMENT AND
REMOVAL OF ONE MOBILE GPS TRACKING
DEVICE IN OR ON A GRAY 2011 MERCEDES
BENZ 350, VEHICLE IDENTIFICATION NUMBER
WDDHF8HB5BA371342, BEARING NEW YORK
LICENSE PLATE NUMBER EMC8588 AND
REGISTERED TO BORIS RAPOPORT

TO BE FILED UNDER SEAL

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
TRACKING WARRANT

(Fed. R. Crim. P. 41;
T. 18, U.S.C., §§
3103a and 3117;
T. 28, U.S.C.,
§ 1651(a))

- - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

      BRIAN COLICA, being duly sworn, deposes and states as

follows:

      1.  I am a Special Agent of the Department of Homeland

Security, Homeland Security Investigations ("HSI") assigned to

the New York Office.

      2. During my tenure with HSI, I have participated in

numerous white collar fraud investigations; and have participated

in all aspects of investigations, including conducting

surveillance, debriefing defendants and informants, interviewing

witnesses, analyzing information obtained from court-ordered pen

register/trap and trace intercepts and monitoring wiretapped

conversations of subjects committing fraud and reviewed line

sheets prepared by wiretap monitors.  Through my training,

education and experience, I have become familiar with (a) the

manner in which frauds are committed; (b) the methods used by
persons committing fraud to launder the proceeds of their
criminal activities; and (c) the efforts of persons involved in
such activity to avoid detection by law enforcement.

　　　　3.   I submit this affidavit in support of an
application for an order pursuant to Federal Rule of Criminal
Procedure 41(b), Title 18, United States Code, Section 3117, and
Title 28, United States Code, Section 1651, authorizing the
installation and monitoring of a Global Positioning System
("GPS") mobile tracking device to be installed by trained
technicians, or authorized representatives of the HSI or another
law enforcement agency in or on a gray 2011 Mercedes Benz 350,
Vehicle Identification Number WDDHF8HB5BA371342, bearing New York
license plate number EMC8588 and registered to Boris Rapoport
("the SUBJECT VEHICLE"), which law enforcement authorities
believe is currently located in the Eastern District of New York,
in order to monitor the movement of the SUBJECT VEHICLE (the
"Requested Information"), for a period of forty-five (45) days.

　　　　4.   I am familiar with the facts and circumstances of
the investigation set forth below through discussions with other
agents and officers of the HSI and other law enforcement agents,
which includes information obtained through surveillance,
interviews with victim-investors, intercepted telephone calls
obtained pursuant to judicially authorized wiretaps, and from my

2

review of records and reports relating to the investigation.
Unless otherwise noted, wherever in this affidavit I assert that
a statement was made, the information was provided by another law
enforcement officer or witness who may have had either direct or
hearsay knowledge of that statement and to whom I or others have
spoken or whose reports I have read and reviewed.  Such
statements are among many statements made by others and are
stated in substance and in part unless otherwise indicated.
Likewise, information resulting from surveillance sets forth
either my personal observations or information provided directly
or indirectly through other law enforcement officers who
conducted such surveillance.  Since this affidavit is being
submitted for the limited purpose of securing an order
authorizing the installation and use of a GPS mobile tracking
device, I have not included details of every aspect of the
investigation.  Facts not set forth herein are not being relied
on in reaching my conclusion that the requested order should be
issued.  Nor do I request that this Court rely on any facts not
set forth herein in reviewing this application.

     5.  Probable cause exists to believe that the Requested
Information will lead to evidence of offenses involving (1) mail
fraud, wire fraud and conspiracy to commit mail and wire fraud,
in violation of 18 U.S.C. §§ 1341, 1343 and 1349; and
(2) laundering the proceeds of mail and wire fraud; and

conspiracy and attempt to commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957 (collectively, the "SUBJECT OFFENSES"), as well as the identification of individuals who are engaged in the commission of these offenses.

6.    In addition, the Requested Information is relevant and material to an ongoing investigation.

7.    For the reasons set out in this affidavit, there is probable cause to believe that the SUBJECT OFFENSES have been committed, are being committed, and will continue to be committed by PETER LIOUNIS, ROMAN TSIMERMAN, TATYANA MALINSKAYA, RUSLAN RAPOPORT ("the SUBJECT INDIVIDUALS") and others known and unknown.   Further, there is probable cause to believe that the SUBJECT INDIVIDUALS and others unknown, intend to use the SUBJECT VEHICLE to commit the SUBJECT OFFENSES.

4

## PROBABLE CAUSE

I.   The Fraudulent Schemes

8.   Between approximately March 2009 and February 2012, PETER LIOUNIS and his co-conspirators executed three successive fraudulent investment schemes through which he obtained millions of dollars from investors based on false promises about investment opportunities. A brief summary of these schemes is set forth below.

A.   The Rockford Group

9.   Between approximately March 2009 until at least November 2009, PETER LIOUNIS executed a fraudulent investment scheme through a company called the Rockford Group.

10.   Through its website, the Rockford Group marketed itself as "[a] leading private equity firm equipped with an $800 million dollar pipeline of investments, designed to provide opportunities for income, capital appreciation and preservation."

11.   The website provided a toll-free number for investors to contact the Rockford Group. The Rockford 800 Number was maintained by Voice Nation LLC ("Voice Nation"), a telephone service that provides an 800-number which can be routed to a user's telephone. Voice Nation also provides a "live answering" service in which employees of Voice Nation answer the 800-number and provide pre-arranged information to outside callers. This service is designed in part to create the

5

impression that the Voice Nation employees worked exclusively for the company paying for the "live answering" service.

12. On the Rockford Website and in telephone calls to investors, the Rockford Group touted the investment value of the "Fixed Dividend Contract" in which the Rockford Group purchased plaintiffs' rights to future recoveries in personal injury and other lawsuits.

13. Through unsolicited telephone calls, representatives of the Rockford Group solicited investments in Fixed Dividend Contracts, and claimed that the Rockford Group had special experience and expertise in this area of investment. The representatives also promised investors that they would earn a fixed rate of return of 15% on investments with the Rockford Group.

14. The Rockford Group solicited over $11 million from at least 200 investors in the United States and Canada. However, no evidence suggests that the Rockford Group used investor funds as it promised its investors it would. Instead, Rockford wired nearly all of the investor funds to bank accounts overseas. Investors with the Rockford Group often received a relatively small portion of their investment as dividend payments in the months following their initial investment. By November 2009, however, investors stopped receiving payments altogether, and

6

none of the Rockford Group investors have received any payments since November 2009.

B.   The UBS Scheme

15.   Between at least September 2010 and November 2010, PETER LIOUNIS, identifying himself as "Andrew Black from UBS," solicited investors to purchase stocks, including an initial public offering ("IPO") of General Motors stock.  LIOUNIS, posing as "Andrew Black," told investors that UBS had acquired Charles Schwab, a claim that was determined by law enforcement authorities to be false.  Law enforcement authorities also determined that no "Andrew Black" had ever worked for UBS.

16.   As part of this fraudulent investment scheme, PETER LIOUNIS, posing as "Andrew Black," instructed the investors to send funds to an entity known as "UBS Clearing Corp." at an address ("the UBS address") that was determined by law enforcement authorities to correspond to a commercial mailbox operated by Regus Management Group LLC ("Regus").  On its website, Regus described itself as a company which provided "Virtual Offices" including "mail and call handling services."

17.   Further investigation revealed that JOHN GIARDINA used a false New York driver's license to open an account for "UBS Clearing Corp" at Regus, and that GIARDINA attempted to use this same false driver's license to cash checks payable to "UBS Clearing Corp" sent by investors.  On November 16, 2010, law

7

enforcement authorities arrested GIARDINA at Regus. At the time of his arrest, GIARDINA was carrying an envelope that had been sent, at the direction of law enforcement authorities, by one of the investors solicited by PETER LIOUNIS as part of the UBS scheme. On April 7, 2011, GIARDINA pled guilty to fraudulent use of an identification document as part of a scheme to defraud, in violation of 18 U.S.C. § 1028.

    C.   The Grayson Hewitt Scheme

        18.  Between at least February 2011 and February 2012, PETER LIOUNIS executed a fraudulent investment scheme through a company called "Grayson Hewitt."

        19.  Using the alias "Mark Anderson" and cellular telephone number (347) 465-0606 ("the Anderson Telephone") PETER LIOUNIS called potential investors and told them that Grayson Hewitt purchases plaintiffs' rights to future recoveries in personal injury and other lawsuits, and promised a fixed rate of return of 15 percent -- the same false claims made by representatives of the Rockford Group.

        20.  Bank records from JP Morgan Chase ("the Chase Account") reflect that an account was opened in the name of "Grayson Hewitt Funding LLC" on May 24, 2010. These bank records, along with other information obtained during the course of the investigation, indicate that IRYNA YAROVA used a false

8

document to open the Chase Account.  Funds obtained from Grayson Hewitt investors were deposited into the Chase Account.

21.    Potential Grayson Hewitt investors received a sales brochure in the mail, which referred to the Grayson Hewitt website.  The Grayson Hewitt sales brochure and website made claims similar to those made in the Rockford sales brochure and website, including a detailed description of Grayson Hewitt's purported business of funding lawsuits.  The Grayson Hewitt Sales Brochure also referenced an 800 number for Grayson Hewitt investors to call.

22.    Much like the Rockford scheme, the Grayson Hewitt 800 Number was maintained by Professional Answering Service ("the Answering Service"), a telephone service that provides a toll-free number ("the Grayson Hewitt 800 Number") which can be routed to a user's telephone.[1]  The Answering Service also provides a "live answering" service in which employees of the service answer the 800-number and provide pre-arranged information to outside callers.  This service is designed in part to create the impression that the Answering Service employees work exclusively for the company paying for the "live answering" service.

---

[1]On or about September 26, 2011 the Grayson Hewitt 800 Number was deactivated, and Grayson Hewitt opened a new 888 number with the Answering Service.  This new number, together with the initial number provided by Grayson Hewitt, is referred to herein as the Grayson Hewitt 800 Number.

23. Records provided by the Answering Service indicate that an account for the 800 Number was opened by "Sam Freed" for "Grayson Hewitt Funding" on or about May 15, 2010. These records further indicate that Answering Service employees were directed to forward callers asking for "Mark" to the Anderson Telephone, and to forward callers asking for "Lance," "Sam" or "Iryna Yarova" to phone number (917) 224-8087 ("the Sam Freed Telephone"), among other numbers.

24. The Answering Service provided law enforcement authorities with a written record of messages transcribed during the fraudulent scheme. These messages reveal that "Sam Freed" was frequently communicating with Grayson Hewitt investors concerning their investments.

25. As with the Rockford scheme, Grayson Hewitt investors often received monthly dividend payments reflecting a relatively small portion of their investment. Like Rockford, Grayson Hewitt did not invest its funds as it promised its investors it would. Instead, a large portion of funds in the Grayson Hewitt bank account was used to purchase gold, meals, clothing and other consumer items.

II. The Identification of Peter Liounis

26. On September 19, 2011, the Honorable Lois Bloom, United States Magistrate Judge, Eastern District of New York, signed an order, Misc. 11-649, ("the First GPS Order")

authorizing disclosure of precise location data for the Anderson
Telephone for a period of 30 days.  On October 18, 2011, Judge
Joan M. Azrack, United States Magistrate Judge, Eastern District
of New York, signed an order extending the First GPS Order for an
additional thirty days.  On January 6, 2012, Judge Azrack signed
another order, Misc. 12-010, ("the Second GPS Order") authorizing
disclosure of precise location data for the Anderson Telephone
for a period of 30 days.  The service provider for the Anderson
Telephone was unable to provide precise location data, and
instead provided records reflecting the tower and antenna face
("cell site") used by the Anderson Telephone during the time
period covered by the First GPS Order and the Second GPS Order
("the GPS Time Period").  These records reflect that, during the
GPS Time Period, the Anderson Telephone was located within a
radius of approximately 0.5 miles of an area of Staten Island
("the Anderson Telephone Area") when nearly every call was made
or received by the Anderson Telephone.

        27.  The residence of PETER LIOUNIS at 59 Genesee
Avenue, Staten Island, New York ("the Liounis Residence") is
located within the Anderson Telephone Area.  On October 25, 2011,
law enforcement authorities conducted an inspection of trash
("the Liounis Trash") which had been removed from outside the

11

Liounis Residence by local trash collectors.[2] This inspection revealed a handwritten note with three lines. Two lines of this note appear to relate to two Grayson Hewitt investors. The other line of the note contains the word "local" and the number for the Sam Freed Telephone.

28. The October 25, 2011 inspection of the Liounis Trash also yielded shipping paperwork that had been sent to PETER LIOUNIS at the Liounis Residence and which listed a telephone number ("the Liounis Telephone") in PETER LIOUNIS'S name. A November 4, 2011 inspection of the Liounis Trash revealed a receipt for the purchase of the Liounis Telephone and a service agreement for the Liounis Telephone in the name PETER LIOUNIS. A January 31, 2012 inspection of the Liounis Trash revealed one page of a bill from AT&T Wireless for the Liounis Telephone. Moreover, telephone records obtained from AT&T Wireless reflect that the Liounis Telephone was activated on June 3, 2011.

29. Law enforcement authorities conducted surveillance of the Liounis Residence on several days in September and October 2011. During this surveillance, law enforcement authorities learned that at least one other person, SCOTT PACCIONE, appears to reside in the Liounis Residence along with PETER LIOUNIS.

---

[2] Local trash collectors provided the Liounis Trash to law enforcement authorities immediately after they had obtained it from outside the Liounis Residence and before mixing it with any other trash.

Nonetheless, on two occasions, law enforcement authorities observed that PETER LIOUNIS appeared to be the only person present inside the Liounis Residence when the Anderson Telephone was in use. As noted above, the Anderson Telephone remained within a 0.5 mile radius of the Liounis Residence during this time period.

30. On November 27, 2011, a Postal Inspector drove past the Liounis Residence and observed PETER LIOUNIS standing outside the Liounis Residence and speaking on a cellular telephone. LIOUNIS was standing on the sidewalk adjacent to the street and next to a stop sign. A Postal Inspector recognized PETER LIOUNIS from a copy of LIOUNIS's United States Passport application obtained from the United States Department of State. While observing LIOUNIS, the Postal Inspector was able to hear his voice, which matched the voice of "Mark Anderson" and "Andrew Black" on recordings provided to law enforcement by two "UBS Clearing Corp" investors.

III. <u>Wiretap of the Mark Anderson Telephone</u>

31. On December 7, 2011, United States District Court Judge Sandra L. Townes signed an order authorizing the interception of wire communications over the Anderson Telephone. On January 6, 2012 and again on February 8, 2012, Judge Townes signed an order reauthorizing the interception of wire communications over the Anderson Telephone. Virtually all of

13

the communications on the Anderson Telephone monitored pursuant to these orders ("the Anderson Wiretap Orders") appear to involve the voice law enforcement authorities previously identified as PETER LIOUNIS. Therefore, it appears that PETER LIOUNIS is the person who used the Anderson Telephone while posing as "Mark Anderson."

32. The wiretap revealed that PETER LIOUNIS, posing as "Mark Anderson," used the Anderson Telephone to communicate with Grayson Hewitt investors and potential investors, and solicit investments based on false claims and promises. The wiretap further revealed that numerous investors had also been solicited to invest with Grayson Hewitt by another individual posing as "Sam Freed." As set forth below, the investigation has revealed that RUSLAN RAPOPORT was the person posing as "Sam Freed" during the Grayson Hewitt scheme.

33. Based on telephone calls intercepted on the Anderson Telephone, pursuant to the February 8 Wiretap, it appears that, as of February 23, 2012, PETER LIOUNIS "closed" Grayson Hewitt and terminated this fraudulent scheme:

(a) During a telephone call on the Anderson Telephone, LIOUNIS, posing as "Mark Anderson," reassured an investor with respect to his purported investment with Grayson Hewitt and told the investor to "sit tight."

14

(b) On February 23, 2012, LIOUNIS, posing as "Mark Anderson," contacted the Answering Service and terminated their services with respect to the Grayson Hewitt 800 number.

(c) Between February 23, 2012 and March 5, 2012, approximately twelve Grayson Hewitt investors left approximately 35 messages for "Mark Anderson" on the Anderson Telephone. LIOUNIS did not return any of these calls, and indeed ceased using the Anderson Telephone altogether after February 23, 2012.

IV. Evidence Demonstrating that Ruslan Rapoport is "Sam Freed"

34. In or about December 2011 and January 2012, law enforcement authorities sent a series of subpoenas to Fed Wire, and obtained information concerning wire transfers of funds sent from the accounts of certain investors. This information revealed that at least one Grayson Hewitt investor wired funds to an entity called "Innovative Commerce Ltd." in the United Kingdom, through a specific wiring code ("the Innovative Commerce Wiring Code").

35. On January 19, 2012, law enforcement authorities conducted a border inspection of RUSLAN RAPOPORT at John F. Kennedy ("JFK") Airport as RAPOPORT was boarding a flight to Germany. During this inspection, law enforcement authorities discovered that RAPOPORT was carrying a note which contained the words "Innovative Commerce Ltd." and the Innovative Commerce Wiring Code. RAPOPORT was also carrying an American Express card

15

in his own name ("the RAPOPORT AMEX Card"). Law enforcement authorities did not detain RAPOPORT at this time and permitted him to proceed on his travels.

36. Records from the Answering Service indicate that beginning on June 1, 2010 and continuing until September 15, 2010, the account holders provided special instructions to the Answering Service to forward all calls to an international phone number with a country code of "380," which is the country code for the Ukraine. Treasury Enforcement Communications Systems ("TECS") records reveal that RUSLAN RAPOPORT traveled from JFK Airport to the Ukraine on May 28, 2010 and returned on September 15, 2010.

37. Moreover, on October 27, 2011, Magistrate Judge Ramon E. Reyes signed a search warrant authorizing law enforcement agents to gather location data for the Sam Freed Telephone. The service provider for the Sam Freed Telephone was unable to provide precise location data, and instead provided records reflecting the tower and antenna face ("cell site") used by the Sam Freed Telephone. This data revealed that, between October 28, 2011 through November 9, 2011, the Sam Freed Telephone was located exclusively in the New York/New Jersey area. Records obtained from the RAPOPORT AMEX reveal that RAPOPORT purchased a round-trip airline ticket to travel on Virgin America from JFK Airport to Los Angeles International

16

Airport on November 10, 2011, returning November 14, 2011.[3]  The
location data for the Sam Freed Telephone reflects that on
November 10, 2011 through November 11, 2011, the Sam Freed
Telephone was located in the Los Angeles area.

38.  Records obtained from the RAPOPORT AMEX reveal
that, on November 10, 2011, RUSLAN RAPOPORT rented a vehicle at
the Fox Rent-A-Car, located at 5500 West Century Blvd. in Los
Angeles, California ("the Rental Car Location").  Location data
for the Sam Freed Telephone reveals that, on November 10, 2011,
the Sam Freed Telephone was located within a radius of
approximately 0.6 miles of the Rental Car Location.

39.  There is no location data available for November
12, 2011 through November 14, 2011, and telephone records suggest
that the Sam Freed Telephone was turned off during this time
period.  Location data for the Sam Freed Telephone further
reflects that, beginning on November 15, 2011, and continuing
through November 28, 2011, the Sam Freed Telephone was again
located exclusively in the New York/New Jersey area.

40.  Records obtained from Laduree, a French bakery in
Manhattan, indicate that the RAPOPORT AMEX was used for a
purchase at Laduree on November 21, 2011 at 3:57 p.m.  Laduree is
located at 864 Madison Avenue, New York, New York ("the Laduree

---

[3]Law enforcement authorities are attempting to obtain a
passenger manifest from Virgin America for these flights.

Location"). Location data for the Sam Freed Telephone reveals that, on November 21, 2011 at 4:08 p.m., the Sam Freed Telephone was located within a radius of approximately 134 meters of the Laduree Location.

41. It therefore appears that RUSLAN RAPOPORT posed as "Sam Freed" while using the Sam Freed Telephone to perpetrate the Grayson Hewitt scheme.[4]

V.   Gold Deliveries and Use of the SUBJECT VEHICLE

42. During the course of the investigation, law enforcement authorities learned that Grayson Hewitt investors mailed checks to a commercial mailbox controlled by Grayson Hewitt ("the Grayson Hewitt Mailbox"). Law enforcement authorities further learned that Grayson Hewitt was using investor funds to purchase gold, and that the gold was being shipped to the Grayson Hewitt Mailbox. On three separate occasions between November 18, 2011 and December 27, 2011, law enforcement authorities conducting surveillance at the Grayson Hewitt Mailbox observed TATYANA MALINSKAYA enter the facility and

---

[4]TECS records reveal that RUSLAN RAPOPORT traveled from JFK Airport to Russia on October 20, 2011 and returned on October 31, 2011 ("the Russia Trip"). Nonetheless, location data for the Sam Freed Telephone reveals that the Sam Freed Telephone was located in Atlantic City, New Jersey on October 29, 2011, and in the area of Brighton Beach, New York on October 31, 2011, approximately one hour before RAPOPORT's return flight from Russia arrived at JFK Airport. It therefore appears likely that another unknown individual who was not posing as "Sam Freed" held the Sam Freed Telephone in the United States during the Russia Trip.

retrieve what appeared to be a package. On each occasion, MALINSKAYA delivered the package to ROMAN TSIMERMAN, who was driving a vehicle ("the TSIMERMAN VEHICLE") registered to his son, EDWARD TSIMERMAN.

43. During surveillance on the last of these three occasions, December 27, 2011, law enforcement authorities clandestinely followed the TSIMERMAN VEHICLE to a residence in Brighton Breach, New York ("the TSIMERMAN RESIDENCE") and observed ROMAN TSIMERMAN park the TSIMERMAN VEHICLE in a paved area behind the TSIMERMAN RESIDENCE. TSIMERMAN then entered the TSIMERMAN RESIDENCE carrying what appeared to be the package that he had received from MALINSKAYA ("the Package").

44. Shortly thereafter, agents observed RUSLAN RAPOPORT enter the TSIMERMAN RESIDENCE and emerge a short while later carrying what appeared to be the Package. Law enforcement authorities then observed RUSLAN RAPOPORT enter the SUBJECT VEHICLE and drive to a large apartment building located at 35 Seacoast Terrace in Brighton Beach, Brooklyn ("the Seacoast Terrace Apartment"). RUSLAN RAPOPORT then entered this building carrying what appeared to be the Package. Agents continued surveillance of the building for approximately one hour, until approximately 9:00 p.m., however RUSLAN RAPOPORT did not emerge from the building. Subsequent investigation revealed that the

SUBJECT VEHICLE is registered to RUSLAN RAPOPORT's father, BORIS
RAPOPORT.

45. On December 28, 2011, law enforcement agents
returned to the Seacoast Terrace Apartment and observed SUBJECT
VEHICLE 2 parked in a parking lot adjacent to the Seacoast
Terrace Apartment. Management from the Seacoast Terrace
Apartment informed law enforcement agents that this parking lot
is a private lot for the use of residents of the Seacoast Terrace
Apartment and an adjacent residential apartment building.

46. On December 29, 2011, United States Magistrate
Judge Steven M. Gold granted the government's application for two
warrants to place tracking devices on Tsimerman Vehicle and the
SUBJECT VEHICLE (11-Misc-884) ("the Prior Tracking Order"). The
devices were clandestinely placed on these vehicles in the
evening of December 29, 2011 and provided location data until
February 8, 2012, when agents removed the devices.

47. Location data provided pursuant to the Prior
Tracking Order revealed that the SUBJECT VEHICLE was located
primarily in the Brighton Beach, Brooklyn area in the Eastern
District of New York from December 29, 2011 through February 8,
2012.

VI. The Express Mail Shipments

48. Records from the United States Postal Service
indicate that between February 16, 2012 and March 6, 2012, six

20

packages were sent to "Mike Slolli," "Mike Sloli" or "Mike Solli" at the Liounis Residence ("the Six Packages"). Moreover, a search of law enforcement databases revealed that there was no record of any person named "Mike Slolli," "Mike Sloli" or "Mike Solli" residing at the Liounis Residence.

49. The sender of each of the Six Packages was listed as "Alex James," "Al Jason" or "Mark Berg." Each of the Six Packages listed a different address for the sender. Law enforcement databases have revealed that there was no record of any person named "Alex James," "Al Jason" or "Mark Berg" residing at any of the addresses provided as the sender's on the Six Packages.

50. It therefore appears that the person sending the Six Packages used fictitious names for both the sender and recipient.

51. Postal Service records further reveal that postage for one of the Six Packages delivered on February 22, 2012 ("the February 22 Package") was purchased using the RAPOPORT AMEX Card. Moreover, video surveillance from the machine which was used to dispense the postage label used for the February 22 Package captured an image of RUSLAN RAPAPORT purchasing the postage label.

21

52. One of the Six Packages listed telephone number (718) 290-5967 ("the 5967 Number") as the contact number for the recipient of the package.

53. As noted above, RUSLAN RAPOPORT was involved in the Grayson Hewitt scheme and likely posed as "Sam Freed" to solicit investors. Moreover, the sender and recipient listed for the Six Packages appear to be false identities -- another hallmark of the fraudulent schemes perpetrated in connection with Grayson Hewitt, UBS and Rockford.

VII. The Seventh Package

54. On March 22, 2012, the Post Office received a package ("the Seventh Package") addressed to "Mike Sloli" at the Liounis Residence. The sender was listed as "Alex James." The 5967 Number was listed as the recipient's telephone number. The Seventh Package therefore appears to be another package sent as part of the same series of packages as the Six Packages. Indeed, records obtained from the Postal Service and Chase Bank reveal that the postage for the Seventh Package was paid using a Chase Visa in the name RUSLAN RAPOPORT.

55. On March 22, 2012, a male claiming to be "Mike Sloli" called the Post Office in Staten Island where the Seventh Package was supposed to be received. The caller provided the Liounis Telephone as the caller's telephone number. The caller asked whether the Seventh Package had arrived. When advised that

22

the Seventh Package had been routed to Albany, instead of Staten Island,[5] the caller responded that the Seventh Package contained "very important" documents that the caller needed. When told that he could call tomorrow to see if the Seventh Package had arrived, the caller responded impatiently, asking whether he could call later in the afternoon to see if the package was being re-routed to Staten Island.

56. On March 22, 2011, Magistrate Judge Joan M. Azrack signed a warrant ("the Package Search Warrant") authorizing agents to search the contents of the Seventh Package. Pursuant to this warrant, law enforcement authorities opened the Seventh Package and discovered $3,400 in cash. After photocopying this cash, agents reinserted the cash into the Seventh Package, resealed it, and the postal service delivered the Seventh Package to the Liounis Residence.[6]

VIII.  Need for GPS Data

57. The GPS data of the SUBJECT VEHICLE sought herein will enable law enforcement authorities to conduct surveillance of RUSLAN RAPAPORT. Based on the evidence described above, it

---

[5]The Seventh Package, in fact, was not routed to Albany, but was instead held in New York by Postal Inspectors. The story about the package being routed to Albany was a ruse to disguise the fact that the Seventh Package was being investigated.

[6]The Affidavit of Michael Wilson, which was submitted on March 22, 2011 in support of the Package Search Warrant, erroneously identified the 5697 Number as "(718) 297-5697". As noted above, the correct number is (718) 290-5697.

appears likely that the cash that RAPOPORT sent to LIOUNIS
represents proceeds of the Grayson Hewitt scheme and payment to
LIOUNIS for his participation in the scheme. Thus, surveillance
of RAPOPORT may enable authorities to determine the source of
these funds, as well as to identify other co-conspirators.
Moreover, in the event law enforcement authorities seek to
question and/or arrest RAPOPORT, the GPS data of the SUBJECT
VEHICLE will enable authorities to readily locate and apprehend
RAPOPORT.

## GPS DATA

58. I have confirmed with HSI technicians that the GPS
mobile tracking device can be installed within the SUBJECT
VEHICLE. The device, once installed and rendered operable,
generates signals that fix the geographic positions of the
SUBJECT VEHICLE. The signals are then read by a satellite that
transmits the location information in a form that a HSI computer
program is able to calculate and project upon a map.

## GROUNDS FOR DELAYING NOTICE

59. Pursuant to 18 U.S.C. § 3103a and, to the extent
applicable, 18 U.S.C. § 2705(a)(2), the government seeks
authorization to delay notification to the registered owners of
the SUBJECT VEHICLE until 30 days from the date on which the
order proposed herein expires. The grounds for this request are
as follows: the investigation of the SUBJECT INDIVIDUALS and

24

others known and unknown is ongoing and is expected to continue for at least another month. Disclosure of the warrant at this time would cause premature termination of the investigation into the SUBJECT INDIVIDUALS and others and most likely cause members of the organization to cease using their vehicles, change telephone numbers that are being or will be monitored through subpoenas, judicially authorized pen registers and wiretaps, and potentially to flee.

### AUTHORIZATION REQUESTED

60. Based on the foregoing, your affiant believes that the Requested Information will lead to evidence of criminal activities by the SUBJECT INDIVIDUALS and others, including the transportation or distribution of the proceeds of mail fraud and wire fraud, as well as to the identification of individuals who are engaged in the commission of those and related crimes. The Requested Information is necessary in order to determine the exact location of the SUBJECT VEHICLE so that law enforcement agents can: (a) monitor the movements of the SUBJECT VEHICLE when it moves about and/or departs the Eastern District of New York; (b) track the SUBJECT VEHICLE's travel without the need for close proximity vehicle surveillance; and (c) identify locations where the SUBJECT VEHICLE is taken to obtain the proceeds of the fraud, as well as to identify the final locations where these proceeds are delivered. The Requested Information will therefore allow

law enforcement agents to observe the SUBJECT INDIVIDUALS and others safely and continuously, and enable them to potentially arrest those individuals and others who will use the SUBJECT VEHICLE to commit the SUBJECT OFFENSES.

61.   WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41(b), Title 18, United States Code, Section 3117, and Title 28, United States Code, Section 1651, it is requested that the Court issue a warrant and Order authorizing the installation and monitoring of one GPS mobile tracking device in or on the SUBJECT VEHICLE by trained HSI technicians or technicians from other law enforcement agencies or by an individual or individuals working under their direct supervision in order to monitor the movement of the SUBJECT VEHICLE for a period of forty-five (45) days.

62.   IT IS FURTHER REQUESTED that the Court authorize technicians and agents with the HSI or technicians from other law enforcement agencies or their authorized representatives to monitor the signals from the GPS mobile tracking device installed within the SUBJECT VEHICLE for a period of forty-five (45) days following the issuance of the Court's Order, including signals produced inside private locations, and other places not open to the public or visual surveillance, and signals produced in the event that the SUBJECT VEHICLE leaves the Eastern District of New York, but remains within the United States.

63. IT IS FURTHER REQUESTED that the Court authorize technicians and agents with the HSI or technicians from other law enforcement agencies or an individual or individuals operating under their direct supervision to surreptitiously access the SUBJECT VEHICLE in the Eastern District of New York in order to repair, replace or remove the GPS mobile tracking device including in the event the SUBJECT VEHICLE travel to private locations, other places not open to the public or visual surveillance, and in the event that the SUBJECT VEHICLE leaves the Eastern District of New York, but remain within the United States.

64. IT IS FURTHER REQUESTED that, because, as set forth above, agents observed that the SUBJECT VEHICLE are parked on private property in the Eastern District of New York, the Court authorize technicians and agents with the HSI or technicians from other law enforcement agencies or an individual or individuals operating under their direct supervision to surreptitiously enter that private property in order to install, repair, replace or remove the GPS mobile tracking device.

65. IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT VEHICLE outside of daytime hours.

27

66.   IT IS FURTHER REQUESTED that this affidavit, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others, except that working copies should be made available to the United States Attorney's Office, the HSI, and any other law enforcement agency designated by the United States Attorney's Office.

Dated:      Brooklyn, New York
            April 3, 2012

                                    _____
                                    BRIAN COLICA
                                    Special Agent
                                    Homeland Security Investigations

Sworn before me this
3rd day of April, 2012

     s/Cheryl L. Pollak

THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK